NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

PAUL SKEENS and JANICE SKEENS,

                    Plaintiffs,

        v.

TARA SHETTER, DET. THOMAS M.
KALICK and THE TOWNSHIP OF
WATERFORD,

                    Defendants.

HON. JEROME B. SIMANDLE

Civil Action
No. 04-4474 (JBS)

**OPINION**

---

APPEARANCES:

Louis M. Barbone, Esq.
Stephen F. Funk, Esq.
JACOBS & BARBONE
1125 Pacific Avenue
Atlantic City, NJ 08401
        Attorneys for Plaintiffs

Gerald J. Corcoran, Esq.
YOUNGBLOOD, CORCORAN, LAFFERTY, & HYBERG, P.A.
3205 Fire Road
P.O. Box 850
Pleasantville, New Jersey 08232
        and
Robert Aaron Greenberg, Esq.
ARONBERG, KOUSER & PAUL
430 Route 70 West
Cherry Hill, New Jersey 08002-3583
        Attorneys for Defendants Township of Waterford and Detective
        Thomas M. Kalick

**SIMANDLE**, District Judge:

        This case involves claims brought by Paul Skeens, a police

officer, alleging malicious prosecution, malicious use of process

and violations of his constitutional rights brought against Tara
Shetter, Detective Thomas Kalick (a fellow police officer) and
Waterford Township (Skeens' employer).   The claims arise out of
charges of harassment and official misconduct - both of which
were terminated in Skeens' favor - brought by Detective Kalick at
the behest of Shetter.   This matter comes before the Court on
defendants Waterford Township and Detective Kalick's motion for
summary judgment.   For the reasons expressed below, Defendants
Waterford Township and Detective Kalick's motion for summary
judgment will be granted and all claims against these two
defendants will be dismissed.

I.   **BACKGROUND**

   A. **Underlying Facts**

   Plaintiff Paul Skeens ("Plaintiff") is a police sergeant in
Waterford Township Police Department.   (Def.'s Statement of
Material Facts ("Def.'s Statement") ¶ 2.)   On September 25, 2002,
Plaintiff was off-duty.   (Id. ¶ 4.)   At approximately 9:00 a.m.,
defendant Tara L. Shetter (hereinafter "Shetter") drove her van,
with a 12-foot trailer in tow, into the parking lot of a Wawa
located on Jackson Road in Waterford Township, New Jersey.   (Id.)
Because the parking lot was full, she circled the parking lot
several times looking for a space large enough to accommodate her
van and trailer.   (Id. ¶ 4-5.)   Resigned to the fact that no such
spaces were available, Shetter pulled along the building where

2

there were two handicapped and three regular spots, parked her van and trailer, and went inside the store to purchase several items.[1]  (Id. at 5.)

Upon exiting the store and getting into her van, Plaintiff stopped Shetter and asked her what right she had to park in the handicap spots.  (Id. at 6.)  Plaintiff was not in uniform and did not identify himself as a police officer and Shetter claimed that Plaintiff used his truck to block her from exiting the store's parking lot.  (Id., Shetter's Written Statement at 1.) Despite the fact that Shetter told Plaintiff that she had a handicap placard, Plaintiff continued to:

> [A]rgue[] with me...[and] continued to interrupt me as I tried to explain"...[and] [Plaintiff] again asked me what right I had to park there and block the spots. As I tried to answer him, he interrupted me again and again....

(Id.)  Finally, Plaintiff moved his vehicle and allowed Shetter to exit the parking lot.  (Id.)  Shetter stated that the "episode bothered [her] all day" and that "[i]t was very upsetting being harassed like I was by this stranger."  (Id.)

On the morning of Friday, September 27, 2002, Plaintiff came to Shetter's home requesting to speak with her about the incident at Wawa.  (Def.'s Statement at 8.)  Although Plaintiff was in

---

[1]  At that time, Shetter did possess a handicap placard allowing her to park in handicap spaces.  (Def.'s Ex. B., Written Statement of Tara Shetter ("Shetter's Written Statement"), dated 10/3/02, at 1.)

uniform, Plaintiff did not identify himself and requested to see
Shetter's license and registration, proof of insurance, and
registration card for her handicap placard.  (Id.)  According to
Shetter, Plaintiff again asked what right she had to park in the
spaces at the Wawa.  (Shetter's Written Statement at 2.)
Shetter's statement reveals that she "tried to explain...[but
Plaintiff] continually interrupted me while I tried to explain."
(Id.)  Shetter continued, stating that Plaintiff "kept on asking
me what right I had to park there and when I would try to answer,
he told me to keep quiet and that my problem was that I didn't
know how to shut up." (Id.)  Plaintiff then "threatened [Shetter]
with a ticket" and "[a]fter 20-30 minutes of interrogating [her],
the officer told [her] that he was letting [her] go with a
warning."  (Id.)

      On either September 28 or 29, Shetter contacted the
Waterford Police Department and described the incident to the
dispatcher who informed her that she would need to speak with
Waterford Chief of Police, John Bekisz.  (Def.'s Statement ¶ 9.)
The dispatcher told Shetter that she would leave messages for
Bekisz regarding the incident.  (Id.)  By Monday afternoon,
September 30, Shetter had not heard from Chief Bekisz so she went
to the Waterford police station.  (Id. ¶ 10.)  Shetter told her
story to Kalick and his colleague, Sgt. Jim Sorce.  (Id.)  Chief
Bekisz attended the meeting briefly and told Shetter that he

would speak to Plaintiff regarding the incident.  (Def.'s Br. at
Ex. 4, Deposition Transcript of Chief John Bekisz at 39-40.)
Kalick documented the meeting in a Special Internal Affairs
Report.  (Pl.'s Br. at Ex. 5.)  Of interest is the fact that the
report states that "at this time [Shetter] did not wish to pursue
this matter criminally."  (Id.)  Following the interview and at
the request of Kalick, Shetter prepared a written statement
setting forth her recollection of the incidents of September 25
and 27.  (Def.'s Statement ¶ 11; Shetter's Written Statement at
1-4.)  Shetter signed the statement and gave a copy to Kalick.
(Def.'s Br. at Ex. C., Deposition of Tara Shetter at 25.)[2]

The Waterford Police Department began an internal affairs
investigation into Shetter's allegations.  (Def.'s Statement ¶
12).  In furtherance of the investigation, Shetter spoke with
Kalick on a number of occasions.  (Id. ¶ 13.)  On November 26,
2002, Shetter returned to the Waterford Police station in order
to sign two formal complaints against Plaintiff - one claiming
harassment and the other claiming official misconduct - that
Kalick had prepared.  (Id. ¶ 14.; Pl.'s Br. at Ex. 14.)  The

_____

[2]  Plaintiff notes that, at the initial meeting between
Shetter, Kalick and Sorce, Shetter testified that Sorce told her
that Plaintiff was a "bully."  (Shetter Depo. Tr. at 24.)  In
addition, Shetter testified that, in a later meeting with Kalick,
Kalick called Plaintiff a "bully" and another obscenity, (id. at
12), told Shetter that Plaintiff had recently made a racist
remark to another officer, (id. at 13), and that Chief Bekisz was
not doing enough to handle the situation and that Shetter should
follow-up further.  (Id. at 25.)

complaints required Shetter, as the complainant, to swear "upon oath" and "to the best of her knowledge, information and belief" the statements contained in the complaints were true.  (Pl.'s Br. at Ex. 14.)

Kalick's deposition testimony reveals that, before he completed the complaints he took two actions.  First, in accordance with the standard police department procedure applying to an internal affairs officer, he contacted Assistant Prosecutor Josh Ottenberg at the Camden County Prosecutor's Office to seek legal advice on what charges, if any, he should file against Plaintiff.  (Def.'s Br. at Ex. C, Deposition Transcript of Det. Thomas Kalick at 76-77; Def.'s Br. at Ex. E, Deposition Transcript of Josh Ottenberg at 30.)  Kalick testified that Ottenberg advised him to charge Plaintiff with harassment and official misconduct.  (Kalick Depo. Tr. at 77-78.)  Ottenberg did not deny that the conversation took place, but testified that he had no recollection of giving Kalick any specific advice or recommendation.  (Ottenberg Depo. Tr. at 38-39.)  Ottenberg is confident that he spoke with Kalick regarding the Shetter incident some time in late November of 2002 because he had his hand-written notes regarding the call.  (Id. at 16-17.; Def.'s Br. at Ex. F.)  These notes contained significant details about the interactions between Shetter and Plaintiff.  (Def.'s Br. at Ex. F.)  Second, Kalick testified that he told Chief Bekisz that

6

(a) Shetter wanted to follow through with filing a complaint against Plaintiff and (b) the complaints were going to include charges of harassment and official misconduct. (Kalick Depo. Tr. at 78-80.)

After Shetter signed the complaints, Kalick gave them to Chief Bekisz who contacted the Camden County Prosecutor's Office and spoke with Assistant Prosecutor Joel Aronow. (Def.'s Statement ¶ 18.) Aronow advised Bekisz not to file the official misconduct complaint but to forward the complaint to the Prosecutor's Office for review. (Id.) Bekisz complied and on December 10, 2002, Aronow sent a letter to Kalick indicating that the Prosecutor's Office intended to dismiss the official misconduct complaint.[3] (Def.'s Br. at Ex. G.) On October 14, 2003, after a municipal court hearing, a municipal court judge dismissed the harassment claim.[4] (Pl.'s Br. at Ex. 11.)

Of note too is the fact that, while Plaintiff was being investigated by Kalik in the Shetter matter, Plaintiff was also being investigated in connection with an incident, that occurred on September 30, 2002, in which Plaintiff was accused of calling

---

[3] It is disputed whether the official misconduct complaint was ever served on Plaintiff. (Def.'s Statement ¶ 20-21; Pl.'s Br. at Ex. 2, Deposition Transcript of Paul Skeens at 110, 111, and 118.)

[4] As a result of the harassment and official misconduct charges, Plaintiff has not lost any regular police time pay, was never fingerprinted, photographed, posted bail or arrested.

another officer (a Sgt. Ruocco) a racist and offensive name.
(Def.'s Statement ¶ 30.)  As a result of that incident, on that
same day, Plaintiff was placed on administrative leave.  (Id. ¶
33.)[5]  On November 21, 2002, Plaintiff was interviewed by the
Camden County Prosecutors Office and in early December, 2002,
Chief Bekisz ordered Plaintiff undergo a psychiatric examination
and a Fitness for Duty Evaluation.[6]  (Def.'s Statement ¶ 35.)
Plaintiff was allowed to return to work in either late December
or early January after completing his Fitness for Duty
Evaluation.  (Pl.'s Response Statement ¶ 33.)

      B.   **Procedural History**

       On July 29, 2004, Plaintiff filed its Complaint in the
Superior Court of New Jersey (Camden County).  With respect to
Kalick, Plaintiff alleges: (1) malicious use of process (Count
One); (2) malicious prosecution (Count Two); and (3) violation of
Plaintiff's constitutional rights under the Fourth, Fifth and
Sixth Amendments (42 U.S.C. § 1983).  With respect to Waterford
Township, Plaintiff alleges liability due to the actions of
Kalick under the doctrine of respondeat superior.

_____

       [5]  While on administrative leave, Plaintiff received his
normal salary but was prohibited from working overtime or special
detail that would allow him to earn approximately $55/hour.
(Pl.'s Response Statement ¶ 34; Def.'s Statement ¶ 34.)

       [6]  Chief Bekisz testified that the psychological evaluation
was partially related to the Shetter incident and partially
related to the Bekisz incident.  (Bekisz Depo. Tr. at 121, 122.)

On September 13, 2004, this matter was removed to this
Court. [Docket Item No. 1.]  After answering the Complaint
[Docket Item No. 5], Defendants Kalick and Waterford Township
filed a motion for summary judgment (on July 28, 2005). [Docket
Item No. 16.]  On August 31, 2005, Plaintiff filed its opposition
[Docket Item No. 17.] to which Defendants replied on September
15, 2005.  [Docket Item No. 19.]  The Court did not hear oral
argument on the motion.  See Fed. R. Civ. P. 78.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."[7]  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable
inferences are to be drawn in [that party's] favor.'"  Hunt v.
Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986).  The threshold inquiry is

---

[7] A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the non-moving party."
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
fact is "material" only if it might affect the outcome of the
suit under the applicable rule of law.  See id.  Disputes over
irrelevant or unnecessary facts will not preclude a grant of
summary judgment.  See id.

whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[8] <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

## III. DISCUSSION

### A. <u>Malicious Prosecution of Official Misconduct Charge</u>

In Count II of the complaint, Plaintiff asserts a common law malicious prosecution tort claim against Kalick.  Under New Jersey law, a malicious prosecution claim may be brought if plaintiff establishes that the defendant (1) instituted proceedings against plaintiff (2) without probable cause and (3) with legal malice, and (4) the proceedings terminated in favor of the plaintiff.  See <u>Trabal v. Wells Fargo Armored Serv. Corp.</u>, 269 F.3d 243, 248 (3d Cir. 2001); <u>see also</u> <u>Lind v. Schmid</u>, 67 N.J. 255, 262 (1975)).  "[P]laintiff's inability to prove any of these four elements is fatal to his continued prosecution of this generally unfavored cause of action." <u>Fleming v. United States Postal Serv., Inc.</u>, 273 N.J. Super. 526, 529 (App. Div. 1994).

---

[8] The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Country Floors v. Partnership of Gepner and Ford</u>, 930 F.2d 1056, 1061-63 (3d Cir. 1991).

### 1.   Institution of Proceedings

Defendants first argues that summary judgment is appropriate because Plaintiff cannot satisfy the first prong of the malicious prosecution claim - that, as to the official misconduct charge, a proceeding was instituted against Plaintiff.[9]  (Def.'s Br. at 16.)  This Court agrees and finds that Kalick did not institute an official misconduct action against Plaintiff, regardless of whether or not Plaintiff was served with the complaint, because Plaintiff was never prosecuted.  On November 26, 2002, at the direction of Shetter, Kalick prepared a criminal complaint for the charge of official misconduct against Plaintiff.  (Pl.'s Br. at Ex. 14.)  After Shetter signed the complaint, Kalick gave it to Chief Bekisz, who then forwarded the complaint to the Prosecutor's Office for review by Assistant Prosecutor Joel Aronow.  (Def.'s Statement ¶ 18.)  This proposed complaint was not filed with the court.  On December 10, 2002, with the

---

[9]  Defendants cite Wozniak v. Pennella, 373 N.J. Super. 445, 454-55 (App. Div. 2004) in which the New Jersey Appellate Division upheld a jury verdict in favor of a plaintiff who brought a malicious prosecution claim who, because a criminal claim filed against him, was summoned to appear in municipal court under threat of arrest, was required to appear in New Jersey Superior Court, and was brought to the Passaic County jail for fingerprinting and to be photographed or a mug shot.  The plaintiff in Wozniak also stated that the suit had a negative impact on his health and that he could not sleep until the case was dismissed three months later.  See id.  In contrast, in the present case, no complaint charging official misconduct was even filed with the court, as the prosecutor promptly declined to endorse it.

official misconduct complaint having yet to be filed, Assistant Prosecutor Aronow sent a letter to Kalick advising him that the complaint had been administratively dismissed by the Prosecutor's Office and requested that Kalick send him the original summons. (Pl.'s Br. at Ex. 6.)  On December 11, 2002, the Prosecutor's Office sent Plaintiff a notice that the official misconduct complaint had been administratively dismissed.  (Pl.'s Br. at Ex. 10.)

Because the Prosecutor's Office unilaterally declined to file the official misconduct complaint, nothing else happened with respect to the complaint.  While the parties dispute whether or not Plaintiff was served with the complaint, this disputed fact is not material because, even if Plaintiff was served, he was never required to defend against the charges in the complaint.  Plaintiff was never arrested, fingerprinted or photographed in connection with official misconduct charge. (Def.'s Statement ¶ 36.)  Plaintiff was never required to attend a hearing and did not retain counsel in connection with this charge.  (Id.)  Indeed, the entire incident - from the day the complaint was signed by Shetter until the day it was administratively dismissed by the Camden County Prosecutor's Office - took approximately two weeks.  It appears that, if Plaintiff even knew of the official misconduct complaint, he only knew about it for a few days, as he testified that he was served

12

with the complaint in "early December" and the complaint was
administratively dismissed on December 11.[10]  (Pl.'s Response
Statement ¶ 21.)

Because Kalick never instituted a criminal action that
Plaintiff had to defend, Plaintiff cannot maintain an action for
malicious prosecution.

### 2.    Absence of Probable Cause

In the alternative, Plaintiff's malicious prosecution claim
fails because Plaintiff cannot prove that Kalick lacked probable
cause.  Because probable cause is an absolute defense to
plaintiff's malicious prosecution claims, see Wildoner v. Borough
of Ramsey, 162 N.J. 375, 389 (2000), the central issue is whether
there was probable cause, or alternatively, whether it was
objectively reasonable for the officers to believe that probable
cause existed at the time the complaints were signed against
Plaintiff.  See id.  In determining whether there was probable
cause to bring and official misconduct charge against Plaintiff
for the September 25 and 27 incidents, the Court looks to the
statutes that Plaintiff allegedly violated.[11]  N.J.S.A. 2C:30-

---

[10]  In Plaintiff's opposition brief, Plaintiff admits that
the official misconduct "charge was administratively dismissed
within days of its issuance...."  (Pl.'s Opp. Br. at 10.)

[11]  The Court need only analyze Plaintiff's malicious
prosecution claim as that claim relates to Kalick's instituting
charges of official misconduct.  As the New Jersey Appellate
Division explained:

2(a) provides that:

> A public servant is guilty of official misconduct when,
> with purpose to obtain a benefit to himself or to
> injure or to deprive another of a benefit...[h]e
> commits an act relating to his office but constituting
> an unauthorized exercise of his official functions,
> knowing that such act is unauthorized or he is
> committing such act in an unauthorized manner....

N.J.S.A. 2C:33-4C.  "Probable cause exists if at the time of the

arrest 'the facts and circumstances within [the officers']

knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent man in believing

that the [suspect] had committed or was committing an offense.'"

Wildoner, 162 N.J. at 389 (quoting Beck v. Ohio, 379 U.S. 89, 91

(1964)).  In a malicious prosecution action, plaintiff bears the

burden of proof that defendant lacked of probable cause.  See

---

> A claim for malicious prosecution arising out of a
> criminal proceeding requires proof that: the criminal
> action was instituted by the defendant against the
> plaintiff; it was actuated by malice; there was the
> absence of probable cause for the proceeding; and it
> was terminated favorably to the plaintiff....  However,
> when the underlying proceeding is civil rather than
> criminal, or based on traffic, disorderly persons, or
> petty disorderly persons charges - involving none of
> the physical constraints ordinarily attendant to the
> criminal process - the cause of action is known as
> malicious use of process and requires proof of a
> deprivation of liberty or "other special grievance."

Turner v. Wong, 363 N.J. Super. 186, 203-04 (App. Div. 2003)
(citations omitted).  Thus, Plaintiff's malicious
prosecution claim relates to Defendants' institution of the
official misconduct charge (a criminal proceeding) while
Plaintiff's malicious abuse of process claim relates to
Defendants' institution of harassment charge.

<u>Lind v. Schmid</u>, 67 N.J. 255, 262-63 (1975)("The plaintiff must establish a negative, namely, that probable cause did not exist.")

In support of his motion for summary judgment, Kalick argued that probable cause existed to levy the official misconduct complaint against Plaintiff.  (Def.'s Br. at 19-20; Def.'s Reply Br. at 1-7.)  Plaintiff counters by arguing that genuine issues of material fact exist as to whether or not Kalick acted as an ordinary prudent person with a reasonable belief that a factual basis for an official misconduct charge existed.  (Pl.'s Opp. Br. at 10-11.  Specifically, Plaintiff argues that the only information available to defendant Kalick at the time he issued the charge were Shetter's statements to police and that, contrary to the Attorney General guidelines regarding the conduct of an internal affairs investigation, Plaintiff was not interviewed before the charges were filed and therefore did not have the benefit of Plaintiff's version of the events.  (<u>Id</u>.)

Considering that Kalick (1) was in possession of Shetter's statements to police and (2) sought legal advice from Assistant Prosecutor Ottenberg related to what criminal charges, if any, to levy against Plaintiff, this Court concludes that, at the time the complaint was signed, Kalick had probable cause to bring an official misconduct charge against Plaintiff.  Based on Shetter's testimony alone - and having no reason to doubt its

trustworthiness - a reasonably prudent person could believe that, on two occasions, Plaintiff, a public servant, berated Shetter, intimidated her and at one point threatened her with a ticket while she stood in a bathrobe in front of her home, for the purposes of scaring, harassing and intimidating her, all arising out of her use of a handicap parking space despite her having a handicapped registration.  Because there was probable cause, Plaintiff cannot maintain a cause of action for malicious prosecution.  For the following reasons, the Court will grant summary judgment in favor of Kalick with respect to Plaintiff's malicious prosecution claim.

### b.   Statements from Shetter

The primary source of Kalick's knowledge comes directly from Shetter.  Kalick interviewed Shetter at the Waterford Township Police Station on September 30, 2002 about the incidents of September 25 and 27.  (Def.'s Statement ¶ 10.)  During the interview, Shetter gave Kalick and Sgt. Jim Sorce a detailed account of the two confrontations between her and Plaintiff which Kalick documented in a Special Internal Affairs Report dated October 1, 2002.  (Pl.'s Br. at Ex. 5.)  Kalick was also in possession of a four-page written statement prepared by Shetter containing her recollection of the events at the Wawa and at her home.  (Id. ¶ 11; Shetter Depo. Tr. at 25; Shetter's Written Statement at 1-4.)  The statement, which was prepared only a few

16

days after the events and at the request of Kalick at their
September 30, 2002 interview, was signed and dated by Shetter and
delivered to Kalick.  (Shetter Depo. Tr. at 28.)

Shetter's written statement provided a detailed account of
her interactions with Plaintiff on both days.  Specifically,
Shetter stated that on September 25, 2002:

- "[A] man...in a silver pick-up truck, pulled in front
  of my van...blocking me from getting out;"  (Shetter's
  Written Statement at 1.)

- Plaintiff did not identify himself to Shetter as
  Shetter referred to him as a "stranger;" (Id.)

- The man "argued with me...[and] continued to interrupt
  me as I tried to explain.  He said that the Coca-Cola
  truck had nothing to do with where I parked [and after
  Shetter showed Plaintiff that she had a handicap
  placard]...He again asked me what right I had to park
  there and block the spots. As I tried to answer him, he
  interrupted me again and again...."  (Id.)

Shetter conveyed the following regarding the incidents of
September 27, 2002 in her written statement:

- "On 9/27/02...[an] officer came to my front
  door...without introducing himself, the officer said
  that he needed to talk with me about where I parked the
  other day at the Wawa and...wanted to see my license,
  registration, insurance, and registration card for my
  handicap placard." (Id. at 2.)

- "I tried to explain...[but] [h]e continually
  interrupted me while I tried to explain...[h]e kept on
  asking me what right I had to park there and when I
  would try to answer, he told me to keep quiet and that
  my problem was that I didn't know how to shut up."
  (Id.)

- "He continued to ask me the same questions.  He then
  threatened me with a ticket." (Id.)

17

- "After 20-30 minutes of interrogating me, the officer told me that he was letting me go with a warning." (Id.)

Kalick also spoke with Shetter one other time about the incident.  (Shetter Depo. Tr. at 12-13.)  The last piece of information Kalick had regarding the events of September 25 and 27 was Shetter's statements contained in the actual complaint filed by Kalick on November 26, 2002.  In that complaint Shetter swore "upon oath... that [the statement contained in the complaint was true] to the best of her knowledge, information and belief."  (Def.'s Br. at Ex. 14.)  Although Shetter later testified that the official misconduct complaint did not contain "her words" and that she didn't type the complaint, the facts outlined in the complaint match those contained in both Kalick's Special Internal Affairs Report and Shetter's written statement. (Pl.'s Br. at Ex. 5; Shetter's Written Statement at 1-2.)

On November 26, 2002, when the official misconduct complaint was filed, Kalick had no reason to doubt the accuracy or truthfulness of Shetter's statement.  Throughout Kalick's investigation, Shetter's statements regarding the incident were consistent.  Shetter's initial statement to police (given on September 30, 2002) and written statement (signed October 4, 2002) were made within a few days of the incidents (which took place on September 25 and 27.)  Moreover, Kalick had no reason to question Shetter's veracity as it did not appear that she had any

18

personal relationship with Plaintiff or any biases towards police officers in general or Plaintiff in particular.  Third, Kalick relied on a sworn statement (the official misconduct complaint) made by Shetter in which Shetter swore that "upon oath" and "to the best of her knowledge, information and belief" that the information in the complaint was true.[12]  Moreover, Plaintiff has provided the Court with no evidence that any statement by Shetter, including the official misconduct complaint, was coerced by Kalick or secured while Shetter was under duress.

Finally, it is true that, by failing to interview Plaintiff prior to filing the complaint, Kalick did not follow the Attorney General's guidelines for internal affairs investigation.  (Pl.'s Ex. 12).[13]  However, the Court concludes that, under the facts of this case, Kalick's failure to follow the Attorney General's guidelines does not taint whether Kalick had probable cause.  Any information that Kalick might have gained from an interview with

---

[12]  The Court notes that there is considerable case law supporting the proposition that a police officer may (and, at times, must) rely on the statements of witnesses when making a probable cause determination.  See Swindell v. New York Dep't of Envtl. Conservation, 371 F. Supp. 2d 172, 179 (N.D.N.Y. 2005); Hotaling v. LaPlante, 167 F. Supp. 2d 517, 522 (N.D.N.Y. 2001).

[13]  The Attorney General's Internal Affairs Policy and Procedures state that "The interview of a police officer as...the subject of an internal affairs investigation...represents a critical stage in the investigative process.  Often the information gained during such an interview will go a long way towards resolving the matter regardless of the outcome."  (Pl.'s Ex. 12 at 1.)

Plaintiff must be weighed against Plaintiff's motivations to
discredit Shetter in order to quash the internal affairs
investigation or prevent Kalick from filing a complaint against
Plaintiff.

In his opposition papers, Plaintiff argues that issues of
fact exist regarding the truthfulness of Shetter's statements to
police because, during the later municipal court proceedings
related to the harassment complaint levied against Plaintiff,
Shetter admitted that Plaintiff never threatened her with a
ticket.  (Pl.'s Ex. 11, Transcript of Hearing in Pine Hill
Municipal Court at 84.)  This argument is unpersuasive.  The fact
that, nearly a year after the official misconduct complaint was
instituted, Shetter contradicted the statements she made to
police in this one respect is not relevant to the good faith
existence of probable cause when the charge was made.  The Court
must review whether Kalick made a reasonable probable cause
determination at the time the complaint was signed.  See
Wildoner, 162 N.J. at 389.  Obviously, at the time the complaint
was signed, Kalick was not privy to contradictions in Shetter's
story that might cause him to question the veracity of Shetter's
statements to the Waterford Township police.

### b.   Advice from counsel

In order to bolster the argument that Kalick had probable
cause to bring the official misconduct charge, Defendants point

to the fact that, prior to instituting the complaints, Kalick
requested and received legal advice from the Camden County
Prosecutor's Office regarding what charges, if any, Kalick should
bring against Plaintiff.  The parties agree that it is standard
practice for an internal affairs officer to contact the police
legal advisor at the Camden County Prosecutor's Office when
unsure whether certain conduct is criminal.  (Ottenberg Depo. Tr.
at 30.)  The parties also do not dispute that, either on the day
or a few days before Kalick instituted the official misconduct
complaint in late November, 2002, Kalick spoke with Assistant
Prosecutor Ottenberg regarding the investigation against
Plaintiff.  (Id.; Kalick Depo. Tr. at 78-80.)  Moreover, it is
clear from Assistant Prosecutor Ottenberg's written notes that
Kalick conveyed to Ottenberg details surrounding the incidents
between Shetter and Plaintiff.[14]  (Def.'s Br. at Ex. F.)  Kalick
testified that he received advice from Assistant Prosecutor
Ottenberg - namely that Ottenberg told Kalick what charges to
levy against Plaintiff.  (Kalick Depo. Tr. at 78-80.)  Ottenberg
does not deny that he gave Kalick advice - he only states that he
does not recall giving Kalick any specific advice regarding
Plaintiff's matter.  (Ottenberg Depo. Tr. at 30.)

---

[14]   Ottenberg's notes contain reference to the fact that an
"officer went to Wawa o/d [off-duty]," that the officer
"berated...blocks her in," and that "2 days later on duty - goes
to house," where Shetter was "in [her] robe."  (Def.'s Br. at Ex.
F.)

In the present case, the fact that Kalick requested legal
advice from Assistant Prosecutor Ottenberg does not serve as an
absolute defense to a malicious prosecution action.[15]  However,
the fact that Kalick called Ottenberg, discussed the facts of
Plaintiff's case and sought his advice supports Defendants'
argument that Kalick had probable cause to levy the charges.
While not serving as an absolute defense, from evidence that (1)
it was standard procedure to seek advice from Ottenberg regarding
whether certain conduct was criminal, (2) that Kalick conveyed to
Ottenberg numerous details about the incidents between Shetter
and Plaintiff, and (3) that, according to Kalick, Ottenberg told
him what charges would be appropriate to bring in a complaint
against Plaintiff (although Ottenberg does not recall giving
"specific advice" or "any recommendations" to Kalick) this Court
can reasonably infer that Kalick called Ottenberg seeking legal
advice regarding the Skeens matter.  Even without relying on
Kalick's testimony that Ottenberg told him what charges to bring

---

[15]  Under New Jersey law, the reliance upon advice of
counsel by a defendant at the time the complaint is signed
constitutes a defense to a malicious prosecution cause of action.
See Lind, 67 N.J. at 263; see also Dombroski v. Metropolitan Life
Ins. Co., 126 N.J.L. 545 (E. & A. 1941); Weinstein v. Klitch, 106
N.J.L. 408 (E. & A. 1929).  However, if order for this defense to
be available to a defendant, the defendant must (1) have provided
evidence that he conveyed a "'full and fair statement' of all
circumstances" to the attorney and (2) received advice from that
attorney.  Kalick did not claim that he provided a "'full and
fair statement' of all circumstances" surrounding the incident,
only that he "told everything" to the Assistant Prosecutor
Ottenberg.

against Plaintiff, Kalick's case for probable cause is bolstered by these actions.

Having concluded that Kalick (1) never instituted a proceeding against Plaintiff and (2) in the alternative, had probable cause to institute the official misconduct claim, this Court need not address the other two prongs of the test for malicious prosecution and grants Kalick summary judgment on this issue.

**B.   Malicious Use of Process regarding Harassment Charge**

In Count I, Plaintiff asserts a common law tort claim of malicious use of process against Kalick.  To state a claim for malicious use of process under New Jersey law, Plaintiff must prove the same elements as for a claim of malicious prosecution including - (1) a proceeding instituted by plaintiff against the plaintiff, (2) with malice, (3) there was an absence of probable cause for the proceeding, (4) the proceeding was terminated favorably to the plaintiff - and the additional element of a deprivation of liberty or a "special grievance."[16]   See Turner, 363 N.J. Super. at 203 citing Lind, 67 N.J. at 262; Giri v. Rutgers Cas. Ins. Co., 273 N.J. Super. 340, 347 (App. Div.

---

[16]   The parties agree that the claim for malicious abuse of process relates only to the charge of harassment in this case (a petty disorderly persons offense).

1994).[17]  Like a malicious prosecution claim, "[t]he absence of any one of these elements is fatal." <u>Brien v. Lomazow</u>, 227 N.J. Super. 288, 300 (App. Div. 1988).

A special grievance exists when a defendant's action has "interfere[d] with [plaintiff's] liberty or property." <u>Penwaq Prop. Co. v. Landau</u>, 76 N.J. 595, 598 (1978).  New Jersey courts have interpreted "liberty" as "including the entire bundle of freedoms afforded by the Constitution...." <u>LoBiondo v. Schwartz</u>, 323 N.J. Super. 391, 424 (App. Div. 1999).  Allegations of mental anguish or emotional distress arising from a prior complaint, or attorney's fees and costs incurred in defending the prior action do not constitute a special grievance to support a malicious use of process claims.  <u>See</u> <u>Penway</u>, 76 N.J. at 598; <u>Brien</u>, 227 N.J. Super. at 304.  However, the "loss of one's ability to practice his or her profession, with a resultant loss of income, does constitute a special grievance." <u>Turner</u>, 363 N.J. Super. at 205.

Defendants' strongest argument in support of its motion for summary judgment on Plaintiff's malicious use of process claim is that Plaintiff cannot demonstrate a deprivation of liberty or other "special grievance." (Def.'s Br. at 14.)  Plaintiff

---

[17]  This standard (including the requirement that a "special grievance" exists) is often referred to when a plaintiff attempts to establish a cause of action for malicious use of process where the underlying "prosecution" involved a civil charge.  <u>See</u> <u>Emri v. Evesham Township Bd. of Educ.</u>, 327 F. Supp. 2d 463 (D.N.J. 2004).

counters by arguing that he can demonstrate a "special grievance"
or deprivation of freedom in that he (1) was required to attend
four separate municipal court hearings throughout a one-year
period (including a trial), and (2) was deprived of his ability
to practice his profession because he was placed on
administrative leave due to the complaints levied against him.
(Pl.'s Opp. Br. at 18-20.)   For the reasons next explained, the
Court finds that Plaintiff cannot prove a "special grievance" and
as such, will grant summary judgment in favor of Kalick on
Plaintiff's claim of malicious use of process[18] and will address
both of Defendant's arguments below.

>    **1.    Whether being required to attend municipal court
>           hearings and trial is a deprivation of freedom
>           sufficient to satisfy the special grievance
>           requirement**

Plaintiff argues that because he was required to attend four
municipal court hearings over the course of a year, he can
establish a special grievance.  Plaintiff rests his argument on
Gallo v. City of Phila., 161 F.3d 217 (3d Cir. 1998) in which the
plaintiff brought a Section 1983 malicious prosecution claim
against the City of Philadelphia alleging that his liberty was
deprived when, after being arrested for arson, he was (i)
required to post a $10,000 bond, (ii) required to attend all

---

[18]  Because Plaintiff must prove all five elements of a
claim malicious use of process (see Brien, 227 N.J. Super. at
300), the Court need not address the merits of the other four
elements of Plaintiff's malicious use of process claim.

court hearings (including a pre-trial hearings, a trial and an arraignment), (iii) required to contact Pretrial Services on a weekly basis, and (iv) prohibited from traveling outside of New Jersey or Pennsylvania.  Id. at 222.  The Third Circuit held that these restrictions amounted to a "seizure" for the purposes of establishing a Section 1983 malicious prosecution claim.  See id. Plaintiff states that he is subject to the similar deprivation of liberty as the plaintiff in Gallo and therefore, can establish a special grievance.  (Def.'s Opp. Br. at 18-19.)

The Court disagrees with Plaintiff.  Recently, the Third Circuit decided a case involving Fourth Amendment rights under a Section 1983 malicious prosecution claim that is factually more similar to the present case than Gallo.  See DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005).  In DiBella, a plaintiff asserted a Section 1983 malicious prosecution action for violation of the Fourth Amendment after plaintiff was required to attend a number of hearings.  Id. at 600.  The Third Circuit held that a plaintiff's attendance at his own pretrial hearings or a trial did not constitute a government "seizure" for purposes of a Section 1983 malicious prosecution claim.  Id. at 603.  The Third Circuit stated that:

> If Gallo was a "close question;" here there could be no
> seizure significant enough to constitute a Fourth
> Amendment violation in support of a Section 1983
> malicious prosecution action.  Gallo was arrested and
> subjected to significant pretrial restrictions.
> [Plaintiffs] were only issued a summons; they were

26

>           never arrested; they never posted bail; they were free
>           to travel.... [Plaintiffs'] liberty was restricted only
>           during the municipal court trials and the Fourth
>           Amendment does not extend beyond the period of pretrial
>           restrictions.

Id. 603.  Here, Plaintiff's situation more closely resembles that
of the plaintiff in DiBella than in Gallo.  Plaintiff was not
arrested or fingerprinted, did not have to post bail, and did not
have his travel restricted in any way.  (Def.'s Statement ¶ 28.)
Like the plaintiff in DiBella, Plaintiff was only required to
attend municipal court hearings (four of them spread across a
one-year period.)[19]  Therefore, the restrictions on Plaintiff's
liberty did not amount to a detention or seizure and Plaintiff
cannot demonstrate a special grievance.

> ### 2.   Whether loss of potential overtime and special detail pay is sufficient loss of income to satisfy the special grievance requirement

Under New Jersey law, "loss of one's ability to practice his
or her profession, with a resultant loss of income, does
constitute a special grievance."  Turner, 363 N.J. Super. at 205.
Plaintiff argues that, because he was placed on administrative
leave and unable to work overtime or special detail work in the
month of December of 2002 due to Defendant Shetter's complaints,

---

[19]  The Court notes that this decision is in line with other
decisions in this District related to common law malicious use of
process claims.  See Bergen v. Gervasi, 1998 U.S. Dist. LEXIS
20755, *10 (D.N.J. 1998)(plaintiff failed the special grievance
requirement under a malicious use of process claim because being
required to attend municipal court hearings to answer charges of
reckless driving did not amount to a deprivation of liberty.)

he lost income.  (Pl.'s Opp. Br. at 19.)

Plaintiff was on administrative leave from the police department from September 30, 2002 through late December, 2002 or early January, 2003.  (Def.'s Statement ¶ 33.)  Plaintiff was placed on administrative leave in September as a result of his derogatory statements made to Ruocco, and not the present circumstances.  (Id.)  While on administrative leave, Plaintiff still received his full salary but was not allowed to work overtime or special duty for which he could earn $55/hour.  (Pl.'s Response to Statement of Material Facts ¶ 13.)  In early December, 2002 while Plaintiff was already on administrative leave due to the Ruocco incident, Chief Bekisz ordered Plaintiff to undergo a Fitness for Duty Evaluation.  Bekisz testified that he ordered the evaluation partially related to "the Shetter matter" and partially due to "the Ruocco matter."  (Bekisz Depo. Tr. at 120, 121.)  Plaintiff was not allowed to return to work until he received the evaluation.

The Court disagrees with Plaintiff that Shetter's inability to earn overtime/special detail pay due to the fact that he was on administrative leave constituted a special grievance related to the harassment complaint related to the Shetter matter.  At this stage, Plaintiff has not (and cannot) prove that Shetter's

28

complaint caused any loss of income for several reasons.[20]

First, at the time Chief Bekisz ordered that Plaintiff remain off the job pending an evaluation, Plaintiff was already on administrative leave for his actions related to the Ruocco matter. Plaintiff has not pointed the Court to any evidence that Plaintiff would have been allowed to return to work from administrative leave but for Shetter's harassment complaint. Second, Plaintiff has not presented any evidence that, but for Shetter filing her complaints, Chief Bekisz would not have ordered the fitness for duty evaluation. In fact the evidence points to the contrary as Chief Bekisz testified that he ordered that Plaintiff undergo an evaluation because of Plaintiff's behavior related to both the Shetter matter and the Ruocco matter. (Pl.'s Response Statement ¶ 35), and that Bekisz ordered that Plaintiff undergo psychological evaluation "primarily because of the Ruocco incident." (Def.'s Ex. I, Bekisz Depo. Tr. at 63-64.) At best, it was a combination of the Shetter matter and the Roucco matter (with the Roucco matter being the primary reason) for Chief Bekisz' order.[21]

---

[20]   To be clear, the Court notes that, while Plaintiff was on leave awaiting psychological evaluation, Plaintiff received his full salary. (Def.'s Statement ¶ 27.) Thus, any "resultant loss of income" would be due entirely to loss of overtime and/or working special detail.

[21]   This holding is consistent with Giri, 273 Super. at 347, a malicious use of process case in which the New Jersey Appellate

Finally, the burden lies with Plaintiff to prove all of the elements of a malicious use of process claim (including proving a special grievance) and Plaintiff simply cannot show that his inability to work overtime or special duty led to any loss of income.  Although Plaintiff did provide evidence that overtime and special detail work was available in December of 2002 (see Def.'s Response ¶ 34, Ex. 13), he failed to include for example, (a) an affidavit that he would have worked some of this overtime or (b) some historical data (in the form of pay stubs or a Form 1099) or testimony regarding the amount of overtime/special detail income he typically earned in the month of December of any given year. (Def.'s Response ¶ 34, Ex. 2)  Surely Plaintiff had this information, as he had been a police officer for 23 years. Thus, Plaintiff has failed to satisfy its burden.

For the foregoing reasons, the Court grants summary judgment in favor of Defendant Kalick on issue of Plaintiff's malicious use of process claim and will dismiss this claim.

C.   **Claims under 42 U.S.C. § 1983**

In Count III, Plaintiff claims that Kalick, under color of state law, violated Plaintiff's rights under the Fourth, Fifth and Sixth Amendments.  Defendants argue that Kalick is entitled

---

Division held that plaintiff had a special grievance because his temporary loss of medical malpractice insurance and loss of income due to the inability to practice medicine were "a direct result of the third party complaint" the defendant filed against plaintiff.

to qualified immunity because Kalick had probable cause to issue the harassment and official misconduct complaints and therefore, summary judgment should be granted in his favor. (Def.'s Br. at 20-24.) Plaintiff counters, arguing that summary judgment is inappropriate because genuine issues of material fact exist as to whether Plaintiff was acting in an objectively reasonable manner when he issued the complaints. As such, the issue of whether he is entitled to qualified immunity is unclear. (Pl.'s Opp. Br.)

Under the doctrine of qualified immunity, police officers, as public officials performing discretionary duties within the scope of their employment, are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The privilege is more than a defense to liability; it is an immunity from suit. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). In determining whether an officer is immune from suit, a court must first inquire whether "the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. If a plaintiff fails to establish that a constitutional right was violated, the matter of qualified immunity is obviated and the inquiry ends. See id. If, however, a violation could be ascertained when the facts are viewed in the light most favorable

to the party asserting the injury, a court must then inquire whether the right was "clearly established" at the time of the officer's allegedly unlawful conduct.  <u>Id</u>.  In making that determination, the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id</u>. at 202.  Put differently, "if the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  <u>Id</u>.  The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991).

### 1.   Fourth Amendment

Plaintiff claims that Kalick violated Plaintiff's Fourth Amendment right "to be free from unreasonable seizures of his person, namely the right to be free from compelled appearances as a defendant in the municipal courts of New Jersey without a threshold finding of probable cause."  (Complaint ¶III.4.)  The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons ...against unreasonable searches and seizures, shall not be violated."

As discussed more fully above in Section III.B., <u>supra</u>, the requirement that a Plaintiff attend pretrial and trial hearings does not constitute a government seizure for purposes of Section

32

1983 action for violation of the Fourth Amendment.  The Third
Circuit has held that "[t]he type of constituted injury the
Fourth Amendment is intended to redress is the deprivation of
liberty accompanying prosecution, not prosecution itself."
DiBella, 407 F.3d at 603 (citing Gallo, 161 F.3d at 223.)
Further, the Third Circuit held that "[i]f Gallo was a 'close
question;' here there could be no seizure significant enough to
constitute a Fourth Amendment violation in support of a Section
1983 malicious prosecution action," id. 603, as Plaintiff's
situation more closely resembles that of the plaintiff in DiBella
than in Gallo.[22]

     As such, the Court concludes that Kalick did not violate
Plaintiff's Fourth Amendment rights.  Having found no violation
of the Fourth Amendment, the Court need not then continue the
qualified immunity analysis by inquiring whether the right was
"clearly established" at the time of the officer's allegedly
unlawful conduct.

                    **2.   Fifth and Sixth Amendment**

     In Count III, Plaintiff also claims that Kalick violated
Plaintiff's right under the Fifth and Sixth Amendment "by

---

     [22]  Plaintiff was not arrested or fingerprinted, did not
have to post bail, and did not have his travel restrained in any
way.  (Def.'s Statement of Material Facts ¶ 28.)  Like the
plaintiff in DiBella, Plaintiff was only required to attend
municipal court hearings and there were only four of them spread
across a one-year period.

manufacturing evidence against the plaintiff for knowing and purposeful use of said evidence in the course of a criminal prosecution commenced against plaintiff." (Complaint ¶III.4.) In their moving papers, Defendants argue that Kalick is entitled to qualified immunity under these claims as well and Plaintiff has failed to address this argument in their opposition papers. Moreover, Plaintiff has failed to provide any evidence that Kalick "manufactured evidence against" Plaintiff for use in the course of prosecuting the official misconduct complaint.

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322-23 (1986); see Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001). Here, Plaintiff has failed to present facts sufficient to establish the existence of an element essential to its Fifth and Sixth Amendment claims - claims on which it would bear the burden of proof at trial. The totality of Plaintiff's allegations and papers fail to point to any facts or circumstances that would implicate, much less prove, that Kalick manufactured evidence against Plaintiff. As such, this Court holds that summary judgment in favor of Kalick on this issue is appropriate.

D. **Claims against Township of Waterford**

In Count IV, Plaintiff asserts a claim against Waterford

34

Township under the doctrine of <u>respondeat</u> <u>superior</u>.  As Kalick's

employer, Plaintiff claims that Waterford Township "is therefore

liable to the plaintiff for injuries and damages caused by

[Kalick]...which were performed in the course and function of his

performance of duty as a police officer in Waterford Township."

(Compl. Count Five ¶ 2.)  The Complaint also states that

Waterford Township "is liable to plaintiff pursuant to the New

Jersey Tort Claims Act."[23]  (<u>Id</u>.)

    Defendants argue that Waterford Township is entitled to

qualified immunity. (<u>Id</u>. at 20, 24.)  Plaintiff argues that

"there was a shocking lack of communication and control over the

internal affairs investigation undertaken by defendant Waterford

Township and its Police Department involving Plaintiff...in

direct defiance of the Attorney General Guidelines which require

a discreet and accountable internal affairs unit."  (Pl.'s Opp.

---

[23]  From a combination of the Complaint and the parties'
moving papers, it is unclear whether Plaintiff asserts his claim
of municipal liability against Waterford Township under 42 U.S.C.
§ 1983 or the New Jersey Tort Claims Act.  Viewing just the
Complaint, the Court would conclude that Plaintiff's claim is
grounded under the New Jersey Tort Claims Act.  However, the
parties' moving papers, particularly Plaintiff's opposition
brief, argue whether summary judgment should be granted under 42
U.S.C. § 1983.  (Pl.'s Opp. Br. at 29-37)(One section of
Plaintiff's opposition brief is captioned: "Genuine Issues of
Material Fact Exist As to Whether Defendant Waterford Township
Was Deliberately Indifferent to Plaintiff by Promulgating a
Policy or Custom that Could Obviously Lead to Constitutional
Violations.") While confusing, the Court ultimately concludes, as
discussed in this Section III.D, that Defendant Waterford
Township is entitled to summary judgment under either the New
Jersey Tort Claims Act or 42 U.S.C. § 1983.

35

Br. at 35-36.)  Plaintiff continues, arguing that "[h]ad a unit been implemented by defendant Waterford Township the confusion that lead to the malicious charges against [Plaintiff] would have been eliminated."  (Id. at 36.)  In support of his position, Plaintiff cites Berg v. County of Allegheny, 219 F.3d 361, 277 (3d Cir. 2000)("The [Supreme] Court noted that no pattern of violations would be necessary to show deliberate indifference [in a §1983 action against a municipality] where it is obvious that a policy or custom would lead to constitutional violations.")

The Court will grant Defendants' motion for summary judgment for two reasons.  First, having already found that Plaintiff's malicious prosecution and malicious use of process claims against Kalick cannot survive summary judgment, the Court cannot then find that Waterford Township is vicariously liable for Kalick's torts under either 42 U.S.C. § 1983 or the New Jersey Tort Claims Act.[24]  Specifically, the Court has already found that Plaintiff suffered no constitutional violations as a result of either the

---

[24]  See N.J.S.A. 59:2-2(b) ("A public entity is not liable [under the New Jersey Tort Claim Act] for an injury resulting from an act or omission of a public employee where the public employee is not liable."; see also Bilbili v. Klein, 2005 U.S. Dist. LEXIS 11464, *38 (D.N.J. Jan. 15, 2005)("[B]ecause Defendants...are immune from liability under the [New Jersey Tort Claim Act], the municipality is immune from liability as well.); Ernst v. Borough of Ft. Lee, 739 F. Supp. 220 (D.N.J. 1990) (holding where officers were immune from liability, borough was also entitled to immunity); see e.g., Grendysa v. Evesham Twp. Bd. of Educ., 2005 U.S. Dist. LEXIS 22748 at *42 (D.N.J. January 27, 2005)(applying to a malicious prosecution claim made under 42 U.S.C. § 1983.)

harassment (because the requirement that Plaintiff attend four municipal court hearings did not constitute a "seizure" under the Fourth Amendment) or official misconduct charges (the complaint was administratively dismissed only a few days after it was filed and Plaintiff was never required to appear anywhere or lost any income due to the complaint.)  (See Sections III.A and C, supra.) The Court also found previously that Kalick had probable cause to bring the official misconduct charge.  (See Sections III.B, supra.)

Alternatively, as discussed in the parties' briefs, Plaintiff cannot maintain a respondeat superior claim against Waterford Township because Plaintiff has failed to show that Waterford Township lacks a viable internal affairs policy or custom.  Municipalities cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior.  See Berg, 219 F.3d at 275 (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)), cert. denied, 531 U.S. 1072 (2001); Kneipp v. Tedder, 95 F.3d 1199, 1211 (3d Cir. 1996) (citing Monell, 436 U.S. at 691).  When a suit against a municipality is based on § 1983, the municipality may only be liable if the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by custom.  See Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, 436 U.S. 658 (1978)), cert. denied,

519 U.S. 1151 (1997).  A plaintiff must first identify a
municipal policy or custom,[25] then "demonstrate that, though its
deliberate conduct, the municipality was the 'moving force'
behind the injury alleged." Berg, 219 F.3d at 276 (quoting Bd.
of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404
(1997)).

Plaintiff has not pointed to any evidentiary support for
their claim that Waterford Township's internal affairs policy or
custom (or lack of policy or custom in this case) would lead to a
constitutional violation.  Such evidence would included a
deposition testimony from Waterford Township police officers that
such a necessary policy was absent, for example.  Instead,
Plaintiff only points to one instance where Kalick and Chief
Bekisz failed to communicate regarding Plaintiff's internal
affairs investigation and failed to interview the subject of an
internal affairs investigation.  Moreover, Plaintiff has provided
no evidence suggesting that it would be "obvious" that the lack

---

[25]The Third Circuit in Beck articulated the two-path track
of the first prong of this inquiry:

> Policy is made when a "decisionmaker possess[ing] final
> authority to establish municipal liability with respect
> to the action" issues an official proclamation, policy,
> or edict.  A course of conduct is considered to be a
> "custom" when, though not authorized by law, "such
> practices of state officials [are] so permanent and
> well-settled" as to virtually constitute law.

Beck, 89 F.3d at 971 (quoting Andrews v. City of Philadelphia,
895 F.2d 1469, 1480 (3d Cir. 1990)).

of such a policy or custom would lead to constitutional violations.  See Berg, 219 F.3d at 277.  Plaintiff's argument has not been fleshed out in any way during discovery.

**IV.  CONCLUSION**

      For the reasons discussed above, this Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment. The accompanying Order is entered.


**March 30, 2006**              **s/ Jerome B. Simandle**
Date                         JEROME B. SIMANDLE
                              United States District Judge